IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LIFECARE MANAGEMENT SERVICES, LLC, | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| INSURANCE MANAGEMENT | § | |
| ADMINISTRATORS, INC., f/k/a | § | Civil Action No. 3:08-cv-1641-M |
| INSURANCE MANAGEMENT | § | |
| ADMINISTRATORS OF LOUISIANA, INC., | § | |
| BEECH STREET CORPORATION, | § | |
| CARTER CHAMBERS, LLC, | § | |
| CARTER CHAMBERS EMPLOYEE | § | |
| BENEFIT PLAN, | § | |
| BILL & RALPH'S INC., and | § | |
| BILL & RALPH'S INC. EMPLOYEE | § | |
| BENEFIT PLAN & TRUST, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

All parties have filed motions for summary judgment. For the reasons stated below, the

Court concludes that the Plaintiff's Motions for Summary Judgment should be **GRANTED** on

its ERISA claims, and otherwise **DENIED**, and Defendants' Motions for Summary Judgment

should be **GRANTED** on Plaintiff's non-ERISA claims and otherwise **DENIED**.

*Background*

A.  LifeCare's Claims

Bill & Ralph's, Inc. ("BRI") employed Bobby Wall, who participated in the BRI

Employee Benefit Plan (the "BRI Plan"), which was administered by Insurance Management

Administrators, Inc. ("IMA").  After suffering an acute stroke, Wall was admitted to Willis-

Knighton Hospital in Shreveport, Louisiana.  On or about April 26, 2007, Wall was transferred

for further medical treatment to a LifeCare Management Services, LLC facility, which is located

on the second floor of Willis-Knighton Hospital.  While there, Wall received intravenous

medications, antibiotics, intubations/ventilator support, respiratory care interventions,

anticoagulation therapy, occupational therapy, and physical therapy.[1]  When Wall went into

cardiac arrest at LifeCare, he was resuscitated and put on a ventilator.[2]  On June 20, 2007, Wall

passed away.  The BRI Plan covers hospital care, but provides no benefits for services rendered

by a "skilled nursing facility."[3]  IMA refused to pay Wall's medical bills of $340,301.14,

determining that LifeCare was a skilled nursing facility and was not a hospital, as those terms are

defined in the BRI Plan.[4]  IMA denied LifeCare's subsequent appeal.  Wall assigned to LifeCare

his claims arising from non-payment of the LifeCare bills.[5]

Carter Chambers, LLC ("Carter") employed Christopher Evans, who participated in

Carter's Employee Benefit Plan (the "Carter Plan"), which was administered by IMA.  After an

accident, Evans suffered a cervical spine fracture that resulted in quadriplegia.  Evans was first

treated at Good Shepherd Hospital and was then transferred to the Baylor Institute for

Rehabilitation, for 118 days of skilled nursing care.  Thereafter, on or about April 29, 2005,

Evans was admitted to LifeCare's Dallas facility for medical treatment.  While at LifeCare,

Evans received wound care, intravenous medications, physical therapy, and occupational

therapy.[6]  IMA determined that LifeCare was a "long-term acute care facility," which is

categorized as a skilled nursing facility under the language of the Carter Plan.[7]  Because the

Carter Plan, unlike the BRI Plan, covers 120 days of skilled nursing care per injury, 118 of which

had already been paid, IMA paid $3,313.52 for two days of Evans's treatment at LifeCare, but

---

[1] P Wall App. at 781-82; IMA Wall Resp. App. at 99-100.
[2] P Wall App. at 781-82.
[3] *Id.* at 164.
[4] *Id.* at 215.
[5] The assignment of Wall's claims was pursuant to a provision in Lifecare's Patient Consent to Treatment Admission Form, which Wall signed on April 26, 2007.  *Id.* at 779.
[6] P Evans App. at 908-09; IMA Evans Resp. App. at 95, 97, 99.
[7] P Evans App. at 104-05, 122; P Wall App. at 184-85 (the BRI Plan).

did not pay Evans's remaining LifeCare bills of $171,898.33. The Carter Plan did not limit the covered duration of a patient's hospital stay, as it did for a stay at a skilled nursing facility.[8] Evans assigned to LifeCare his claims arising from non-payment of the LifeCare bills.[9] Defendants do not dispute that the treatment of Wall and Evans was proper, and their conclusion that LifeCare operated skilled nursing facilities, rather than a hospital, is the sole basis for the denial of the claims.[10]

On February 16, 2010, the Court consolidated the Evans suit (3:08-CV-1642-M) into the Wall suit. LifeCare seeks to recover its bills, for services rendered to Wall and Evans, from the BRI and Carter Plans (collectively "the Plans"), BRI, Carter, and IMA, under ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B). LifeCare sues IMA and Beech Street Corporation for breach of contract, and BRI, Carter, IMA, and the Plans for deceptive insurance practices, under Texas Insurance Code § 541.151 and Texas Deceptive Trade Practices Act § 17.46(b) (the "DTPA").

B. Plan Administration

LifeCare and the predecessor to Beech Street[11] entered into a Facility Service Agreement, under which LifeCare would provide medical services to individuals covered under certain benefit plans in a network administered by Beech Street.[12] That agreement provided for payments to LifeCare under a fee schedule, and Beech Street agreed that its Payors would "use all reasonable efforts to make all payments due" to LifeCare within thirty days following the Payor's receipt of a "clean claim."[13] The Facility Service Agreement also obligated Beech Street

---

[8] P Evans App. at 104-07.
[9] The assignment of Evans's claims was pursuant to a provision in Lifecare's Patient Consent to Treatment Admission Form, which Evans signed on April 29, 2005. *Id.* at 907.
[10] P Wall App. at 50.
[11] Beech Street is a Preferred Provider Organization or a "PPO."
[12] P Wall App. at 756-776; P Evans App. at 876-897.
[13] P Wall App. at 768.

to "use its best efforts to assist [LifeCare] in resolving claim disputes with Payors," although Beech Street is not liable for the payment of Plan benefits.[14]  One of Beech Street's Payor Agreements was with IMA, which agreed to pay Beech Street's participating providers, of which LifeCare was one, at negotiated rates for covered services rendered to plan participants.[15]

The BRI and Carter Plans identify BRI and Carter as their respective Plan Administrators.[16]  Under the Plans, Plan Administrators have the following responsibilities:

(1) To administer the Plan in accordance with its terms.
(2) To interpret the Plan, including the right to remedy possible ambiguities, inconsistencies or omissions.
(3) To decide disputes which may arise relative to a Plan Participant's rights.
(4) To prescribe procedures for filing a claim for benefits and to review claim denials.
(5) To keep and maintain the Plan documents and all other records pertaining to the Plan.
(6) To appoint a Claims Administrator to pay claims.
(7) To perform all necessary reporting as required by ERISA.
(8) To establish and communicate procedures to determine whether a medical child support order is qualified under ERISA Sec. 609.
(9) To delegate to any person or entity such powers, duties and responsibilities as it deems appropriate.[17]

BRI and Carter each executed an Administration Contract appointing IMA as their Claims Administrator, thereby delegating certain administrative duties to IMA.  Although IMA had many ministerial duties, it also had the obligation under the Administration Contracts to:

[p]rocess all claims presented for benefit under [the] Plan, whether self-funded or insured, audit self-funded claims, prepare the claim worksheet on self-funded benefits, audit claims processed by selected Insurance Carrier to determine accuracy, distribute checks in payment of claims to employees or service providers, and provide an explanation of claim settlements to the Plan Participant and Plan Administrator.[18]

---

[14] Beech App. at 49; P Evans App. at 881.
[15] P Wall App. at 310.
[16] P Wall App. at 206, 213; P Evans App. at 143, 149.
[17] P Wall App. at 206; P Evans App. at 143.
[18] P Wall App. at 418, 423.

IMA representatives testified in their depositions as to how IMA processes claims under the BRI and Carter Plans. IMA's claims examiners determine whether claimed benefits are covered under the Plan and make an initial decision to pay or deny a claim.[19] If a claim is denied, the patient or the healthcare provider can appeal to IMA, which maintains two levels of appellate review. IMA's claims examiners, claims managers, and auditors exercise discretion when deciding which claims to pay, but they are bound to follow the applicable Plan.[20] Although BRI and Carter review the claims IMA determines should be funded under their Plans, they do not always see claims that are routinely denied.[21]

IMA determined that LifeCare operated skilled nursing facilities, as that term is used in the Plans.[22] IMA determined that Wall and Evans's claims were routine and that "[t]here would have been no reason to discuss" the claims with BRI or Carter.[23] When LifeCare asked why Wall's claim was denied, IMA faxed LifeCare a letter stating: "Your facility does not meet the definition of a hospital as defined in the plan. Your facility is a rehab facility as defined in the plan. This plan does not have rehab benefits."[24] IMA sent a similar letter to LifeCare about Evans's claim, stating that IMA had verified that LifeCare is a long-term acute care facility and that no additional benefits were available to Evans for such services under the Carter Plan.[25]

---

[19] *Id.* at 270.
[20] *Id.* at 12, 14.
[21] *Id.* at 275.
[22] *Id.* at 23, 39, 40, 271, 275; P Evans App. at 27-28, 42-43.
[23] P Wall App. at 275.
[24] *Id.* at 215. The term "rehab facility" appears to have been used in error, because there is no category for "rehabilitation facilities" in the BRI Plan, and IMA's claims administrator clarified in her deposition that benefits were denied as to Wall's claim because IMA found that LifeCare operated a skilled nursing facility. *Id.* at 23, 164-65.
[25] P Evans App. at 217.

*Legal Standard*

A.  Summary Judgment Standard

Summary judgment is warranted if the pleadings, discovery, disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[26]  A genuine issue of material fact exists when a reasonable jury could find for the non-moving party.[27]  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.[28]  Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate, by designating specific facts beyond the pleadings that prove the existence of a genuine issue of material fact.[29]  In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant."[30]

B.  ERISA Standard

Because the Plans vested BRI and Carter with discretionary authority to determine eligibility for benefits, the Court reviews the denial of benefits for abuse of discretion.[31]  In the Fifth Circuit, courts generally apply a two-step analysis to determine whether the plan administrator abused its discretion.[32]  A court first determines whether the administrator's interpretation of the plan was legally correct by considering three factors:  "(1) whether the

---

[26] Fed. R. Civ. P. 56(c).
[27] *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[28] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).
[29] *See* Fed. R. Civ. P. 56(e)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).
[30] *Lynch Props.*, 140 F.3d at 625 (citation omitted).
[31] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004).
[32] *See Pylant v. Hartford Life & Accident Ins. Co.*, 497 F.3d 536, 540 (5th Cir. 2007).

administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan."[33]

The most important of the three factors—the second—is whether the interpretation is consistent with a fair reading of the plan, and a court "must interpret ERISA provisions as they are likely to be 'understood by the average plan participant, consistent with the statutory language.'"[34] When determining whether a plan has been given a uniform construction, a court considers whether a plan administrator consistently applied the plan to similarly situated applicants.[35] Finally, a court gauges unanticipated costs to the plan by making "an inquiry into the plain reading of the plan language and whether a proposed alternate reading would result in costs unanticipated under the plain meaning."[36]

If a court finds that the administrator's interpretation and application of the plan is legally correct, the inquiry ends, because no abuse of discretion occurred.[37] If the administrator's interpretation of a plan was legally incorrect, a court considers three factors to determine whether the administrator abused its discretion: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith."[38] The decision to deny benefits must be supported by substantial evidence

---

[33] *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008).
[34] *Id.* at 313-14 (internal citation omitted).
[35] *See Fralick v. Plumbers & Pipefitters Nat'l Pension Fund*, No. 3:09-CV-0752-D, 2010 WL 2563429, at *12 (N.D. Tex. June 22, 2010) (citing *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 258 (5th Cir. 2009)).
[36] *Crowell*, 541 F.3d at 316.
[37] *UNOCAL*, 570 F.3d at 257.
[38] *High v. E-Systems Inc.*, 459 F.3d 573, 577 (5th Cir. 2006) (quoting *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639, 637-38 (5th Cir. 1992)).

and not be arbitrary and capricious.[39]  Substantial evidence has been defined as "more than a scintilla, less than a preponderance," and is comprised of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[40]  In contrast, a decision is arbitrary and capricious if it was "made without a rational connection between the known facts and the decision or between the found facts and the evidence."[41]

Because BRI and Carter had ultimate responsibility to determine eligibility for benefits, and in turn paid benefits determined to be eligible, they operated under a conflict of interest, which will be weighed as a factor in determining whether an abuse of discretion occurred.[42]  A court applies a "sliding scale standard," which gives less deference the greater the evidence of a conflict.[43]  Because BRI and Carter had no apparent involvement in the denial of Wall's and Evans's claims and because LifeCare provided no evidence showing an actual significant conflict, the Court reviews the decision with "only a modicum less deference" than it would have otherwise.[44]

Factual determinations under an ERISA plan are also reviewed for abuse of discretion.[45]  When assessing factual questions, a court is confined to the evidence before the plan

---

[39] *See Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 397-98 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)).

[40] *Corry*, 499 F.3d at 398.

[41] *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828 (5th Cir. 1996).

[42] *See Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2346 (2008); *UNOCAL*, 570 F.3d at 257-58 (noting that the conflict of interest is not considered when determining whether an administrator's interpretation of the plan is legally correct and only bears on whether there was an abuse of discretion).

[43] *See Corry*, 499 F.3d at 398; *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999) (en banc); *see generally Metro Life*, 128 S.Ct. at 2351 ("The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.").

[44] *Corry*, 499 F.3d at 398 (citing *Vega*, 188 F.3d at 301); *Garcia v. Am. United Life Ins. Co.*, No. 5:07-CV-63, 2009 WL 6327459, at *12 (E.D. Tex. Dec. 9, 2009) (noting that the plaintiff bears the burden to show that a conflict of interest undermined the administrator's determination).

[45] *See Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 226 (5th Cir. 2004).

administrator.[46]  The plan administrator is obligated to identify the evidence in the administrative record, which consists of the relevant information that the administrator had a fair opportunity to consider prior to suit.[47]  "Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim."[48]  Fifth Circuit precedent supports a district court's decision, when conducting an abuse of discretion review, to limit its review to those facts presented to the administrator.[49]  If the record does not support an administrator's denial of benefits, a court may find an abuse of discretion and award the amount due on the claim and attorney fees.[50]

*Analysis*

I.  Preemption of State Law Claims

Defendants seek summary judgment that LifeCare's breach of contract claim is preempted by ERISA.  LifeCare asserts that IMA breached the "intertwined" Facility Service Agreement, Payor Agreement with Beech Street, and Administration Contract with BRI and Carter, by failing to pay for the medical services LifeCare rendered.[51]  Beech Street[52] allegedly breached its duty under the Facility Service Agreement to "use its best efforts to assist [LifeCare]

---

[46] *See Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 394 (5th Cir. 2006); *Vega*, 188 F.3d at 299.
[47] *See Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 215 F.3d 516, 521 (5th Cir. 2000) (citing *Vega*, 188 F.3d at 299).
[48] *Id.*
[49] *Fralick*, 2010 WL 2563429, at *5 (citing *Wildbur*, 974 F.2d at 642).
[50] *Bratton*, 215 F.3d at 521.
[51] Wall Compl. at ¶ 14; Evans Compl. at ¶¶ 14, 18.  IMA was not a party to the Facility Service Agreement.
[52] Only Lifecare's claims against Beech Street related to Evans are before the Court.  All claims asserted between Lifecare and Beech Street related to Wall have been stayed pending arbitration, which the Court compelled pursuant to the arbitration clause in the Facility Services Agreement underlying the claims in the Wall case.  (Order, Wall ECF No. 35.)  There was no similar arbitration clause in the Facility Services Agreement underlying the claims in the Evans case.

in resolving claim disputes with [IMA]."[53]  A breach of contract claim seeking to recover

benefits due under an ERISA-governed plan is preempted by ERISA.[54]  LifeCare's breach of

contract claim against IMA, which relates to benefit plans governed by ERISA and seeks

damages equal to unpaid benefits, is therefore preempted under ERISA § 502.[55]  LifeCare's

claim that Beech Street failed to use its best efforts to correct IMA's misinterpretation of the

Plans and help LifeCare obtain benefits depends chiefly on LifeCare's right to payment under the

Plans and on the interpretation of Plan terms, and is therefore preempted.[56]

LifeCare's deceptive insurance practices claim asserts that LifeCare relied on Beech

Street's representation in the Facility Service Agreement that it was a "Participating Facility"

and that it suffered injury when IMA denied benefits to the Plan participants.[57]  This claim is

based on IMA's determination that LifeCare operated skilled nursing facilities and is derived

from LifeCare's claimed right to recover benefits under the Plans, and is therefore similarly

---

[53] Wall Compl. at ¶ 23; Evans Compl. at ¶ 26.  This statement is reproduced in context:  "[Beech Street] shall not be responsible or liable for any claim decisions or for the payment of any claims submitted by [LifeCare] for furnishing Covered Services or non-Covered Services to Eligible Persons.  [Beech Street] shall not be an insurer, guarantor or underwriter of the responsibility or liability of any Payor to provide benefits pursuant to any Plan.  [Beech Street] will use its best efforts to assist [LifeCare] in resolving claim disputes with Payors."  Beech App. at 49.  Although the Court finds that the breach of contract claim is preempted, in the alternative, the Court would grant summary judgment based on the waiver of liability.

[54] *See Ellis*, 394 F.3d at 276 n.34; *Meyers v. Tex. Health Res.*, No. 3:09-CV-1402-D, 2009 WL 3756323, at *5 (N.D. Tex. Nov. 9, 2009).

[55] LifeCare's reliance on *Baylor Univ. Med. Ctr. v. Epoch Group, L.C.*, 340 F. Supp. 2d 749, 755 (N.D. Tex. 2004), is misplaced.  The *Epoch* court held that a health care provider's breach of contract claim was not preempted, where the provider sued on its own behalf, as a creditor.  *Id.* at 759-60.  Here, LifeCare sues under an assignment of rights and seeks to recover benefits owed to the Plan participants under ERISA.  As noted in *Epoch*, "[a] hospital's state law claims for breach of fiduciary duty, negligence, equitable estoppel, breach of contract, and fraud are preempted by ERISA when the hospital seeks to recover benefits owed under a plan to a plan participant who has assigned her right of benefits to the hospital."  *Id.* at 759.

[56] *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 213 (2004) (preempting state law claims under ERISA because "interpretation of the terms of [plaintiffs'] benefit plans form[ed] an essential part of their [state law] claim" and noting that there would be no state question if the benefits at issue were not available under the plans); *Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 579 F.3d 525, 530 (5th Cir. 2009) ("A claim that implicates the *rate* of payment as set out in the Provider Agreement, rather than the *right* to payment under the terms of the benefit plan, does not run afoul of *Davila* and is not preempted by ERISA.") (emphasis in original); *Quality Infusion Care Inc. v. Humana Health Plan of Tex., Inc.*, 290 F. Appx. 671, 680-81 (5th Cir. 2008) (unpublished) (preempting a state law claim that relied on plan terms and depended upon the plan for the right to and amount of payment); *Best v. Exxon Mobil Corp.*, No. H-09-0625, 2010 WL 1169984, at *5 (S.D. Tex. Mar. 23, 2010) (looking to whether damages would consist of plan benefits had the contract not been breached).

[57] Wall Compl. at ¶¶ 32-36; Evans Compl. at ¶¶ 35-39.

preempted.[58]  Thus, Defendants' Motions for Summary Judgment on the non-ERISA claims are

granted.

## II.  Plaintiff's and Defendants' Motions for Summary Judgment as to ERISA Claims

### A.  Claim against IMA

IMA contends that ERISA does not provide a cause of action against a plan

administrator.  In *Bernstein v. Citigroup, Inc.*, this Court addressed a similar issue.[59]  While

noting that the issue had not been directly addressed by the Fifth Circuit, this Court held that "a

claim under § 1132(a)(1)(B) is not *per se* limited to plan defendants,"  and cited many decisions

holding that plan administrators may also be sued under the statute.[60]  This Court also noted that,

in determining whether an entity is a plan administrator subject to suit, "courts do not look to the

legal status of an entity under §1002(16)(A); rather, they consider whether an entity actually

controls administration of the plan."[61]  The Court considers the entity's level of responsibility in

---

[58] *See Hogan v. Kraft Foods*, 969 F.2d 142, 144-45 (5th Cir. 1992); *Martinez v. Unum Life Ins. Co. of Am.*, No. H-07-1988, 2007 WL 3342606, at *3 (S.D. Tex. Nov. 9, 2007) ("The Fifth Circuit has . . . held that ERISA preempts claims related to the denial of ERISA benefits that are based on the Texas Deceptive Trade Practices Act and the Texas Insurance Code."); *cf. Transitional Hosps. Corp. v. Blue Cross & Blue Shield of Tex., Inc.*, 164 F.3d 952, 955 (5th Cir. 1999).

[59] No. 3:06-CV-209-M, 2006 WL 2329385, at *7 (N.D. Tex. July 5, 2006).  *See also Am. Surgical Assistants, Inc. v. Great W. Healthcare of Tex., Inc.*, No. H-09-0646, 2010 WL 565283, at *3 (S.D. Tex. Feb. 17, 2010); *Franklin v. AT&T Corp.*, No. 3:08-CV-1031-M, 2008 WL 5156687, at *2-3 (N.D. Tex. Dec. 9, 2008) (Lynn, J.) (permitting suit against a claims administrator); *see generally Pippin v. Broadspire Servs., Inc.*, No. 05-2125, 2006 WL 2588009, at *2-3 (W.D. La. Sept. 8, 2006) (refusing to dismiss claims against a third-party administrator who exercised discretionary authority over the plan).

[60] *See Hall v. LHACO*, Inc., 140 F.3d 1190, 1194 (8th Cir. 1998) ("[T]he proper party against whom a claim for ERISA benefits may be brought is the party that controls administration of the plan . . . .") (internal quotation omitted); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997) (entertaining a suit against the plan administrator to recover benefits pursuant to § 1132 (a)(1)(B)); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989) ("In a recovery of benefits claim, only the plan and administrators and trustees of the plan in their capacity as such may be held liable.").

[61] *Bernstein*, 2006 WL 2329385, at *7 (citing *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997)); *Am. Med. Assoc. v. Un. Healthcare Corp.*, No. 00Civ.2800(LMM)(GWG), 2002 WL 31413668, at *6 (S.D.N.Y. Oct. 23, 2002) ("Insofar as any of the insurance company defendants in this action actually controlled the distribution of funds and decides whether or not to grant benefits under one of the plans, these entities may be sued as plan administrators.")).

evaluating what benefits were payable under the plan and whether the entity was responsible for receiving, processing, and investigating claims.[62]

IMA determined that LifeCare operated skilled nursing facilities, rather than hospitals, as defined by the Plans.[63] IMA found the Wall and Evans claims to be "routine," and denied them without guidance from BRI and Carter, which had no involvement with the claims at issue.[64] IMA was responsible for receiving, processing, and investigating claims, and the Court concludes that, as such, it is subject to suit under ERISA.

B. Exhaustion

IMA argues that LifeCare did not appeal the denial of Evans's coverage within 180 days, as required by the Carter Plan.[65] However, IMA's May 31, 2005, August 4, 2005, and August 22, 2005 Explanation of Benefits documents[66] did not comply with federal requirements, by failing to (1) refer to specific plan provisions on which the determinations were based, (2) describe additional information necessary for LifeCare to perfect its claims, and (3) note LifeCare's right to bring a civil action under ERISA § 502(a).[67] Accordingly, LifeCare is deemed to have properly exhausted its administrative remedies.[68]

---

[62] *Franklin*, 2008 WL 5156687, at *3.

[63] P Wall App. at 23, 271, 275. *See, e.g.*, *Silvertooth v. UNUM Life Ins. Co.*, 3:99-CV-0519-M, 2001 WL 21262, at *4 (N.D. Tex. Jan. 8, 2001) (Lynn, J.) (applying the abuse of discretion standard when a claims administrator made factual determinations of disputed plan terms).

[64] P Wall App. at 275.

[65] IMA Evans App. at 70.

[66] *Id.* at 96, 98, 100.

[67] *See* 29 C.F.R. § 2560.503-1(g)(1); *see also Belmonte v. Examination Mgmt. Servs., Inc.*, No. 3:07-CV-552-L, 2010 WL 1741330, at *4 (N.D. Tex. Apr. 29, 2010) ("By rule, a plan's failure to comply with such regulations shall result in the claimant being deemed to have exhausted the administrative remedies available.").

[68]*See* 29 C.F.R. § 2650.503-1(k)(l).

C.  Interpretation of the Plans

1.  Fair Reading

a.  Definition of "Skilled Nursing Facility" under the Plans

The Plans define a skilled nursing facility as a facility that fully meets all of the following

elements:

> 1. It is licensed to provide professional nursing services on an inpatient basis to persons convalescing from injury or sickness.  The service must be rendered by a registered nurse (R.N.) or by a licensed practical nurse (L.P.N.) under the direction of a registered nurse.  Services to help restore patients to self-care in essential daily living activities must be provided.
>
> 2. Its services are provided for compensation and under the full-time supervision of a Physician.
>
> 3. It provides 24 hour per day nursing services by licensed nurses, under the direction of a full-time registered nurse.
>
> 4. It maintains a complete medical record on each patient.
>
> 5. It has an effective utilization review plan.
>
> 6. It is not, other than incidentally, a place for rest, the aged, drug addicts, alcoholics, mental retardates, Custodial or education care or care for Mental Disorders.
>
> 7. It is approved and licensed by Medicare.[69]

The Plans state that the term "skilled nursing facility" also applies to "charges incurred in

a facility referring to itself as an extended care facility, convalescent nursing home, rehabilitation

hospital, *long term acute care facility* or any other similar nomenclature."[70]  LifeCare contends

that a facility holding itself out as a long-term acute care facility must satisfy all seven elements

to be considered a skilled nursing facility.  Defendants argue that any facility that holds itself out

as a long-term acute care facility is *ipso facto* a skilled nursing facility, regardless of whether the

---

[69] P Wall App. at 184-85; P Evans App. at 122.
[70] P Wall App. at 184-85 (emphasis added); P Evans App. at 122.

13

seven elements are established.  However, Defendants' interpretation was not the basis for

IMA's determination that LifeCare operated skilled nursing facilities.  Alana Bennett, Claims

Manager for IMA, testified in her deposition that a long-term acute care facility is considered a

skilled nursing facility only if all seven elements are met.[71]  Ms. Bennett also stated that Wall

and Evans's claims were denied based on IMA's finding that LifeCare satisfied all seven

elements of a skilled nursing facility, as defined in the Plans.[72]  A court is obliged to "ignore

ERISA plan interpretations that did not actually furnish the basis for a plan administrator's

benefits decision," because courts do not "permit ERISA claimants denied the timely and

specific explanation to which the law entitles them to be sandbagged by after-the-fact plan

interpretations devised for purposes of litigation."[73]  The Court does not consider an

interpretation of the Plans that was not the basis for IMA's determinations.  Therefore,

Defendants must identify evidence in the administrative record supporting IMA's determination

that both LifeCare locations met all seven elements of a skilled nursing facility.

 The Court considers only the administrative record when reviewing IMA's factual

determination that LifeCare operated skilled nursing facilities.  IMA made three findings before

denying Wall and Evans's claims:  LifeCare advised IMA on two occasions that it was a long-

term care facility,[74] IMA confirmed with Medicare that Medicare classified LifeCare as a long-

term acute care facility, and  ppoNext listed LifeCare as a long-term care facility.[75]  Because

LifeCare held itself out as a long-term care facility, it can be considered a skilled nursing facility,

---

[71] P Wall App. at 29-30.

[72] *Id.* at 31.

[73] *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 1012 (8th Cir. 2005); *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998); *see, e.g., Farr v. Hartford Life & Acc. Ins. Co.*, 322 F. Appx. 622, 628 (10th Cir. 2009); *Pacconi v. Trustees of the United Mine Workers of Am.*, 264 F. Appx. 216, 217 (3d Cir. 2008); *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349  F.3d 1098, 1104 (9th Cir. 2003); *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000).

[74] IMA Wall Br. at 17; IMA Evans Br. at 27; IMA Wall App. at 111.

[75] ppoNext was the network provider involved in the Evans's claim and was a predecessor to Beech Street.

*if* the seven elements of same are satisfied.  LifeCare's classification by Medicare goes to the seventh element of a skilled nursing facility, but LifeCare's listing by ppoNext is irrelevant.  Although IMA investigated LifeCare's classification by Medicare, it apparently made no findings regarding elements one through six of the Plans' listed characteristics of a skilled nursing facility.  Because *all* seven elements must be met, but IMA never determined that they were, IMA's conclusion that LifeCare operated skilled nursing facilities was inconsistent with a fair reading of the Plans when applied to the relevant facts.  Therefore, the most important factor of the "legally correct" test weighs in favor of LifeCare.

b.  Definition of "Hospital" under the Plans

Defendants argue that IMA properly determined that the LifeCare facilities were not hospitals.  The Plans define a hospital as follows:

> Hospital is an institution which is engaged primarily in providing medical care and treatment of sick and injured persons on an inpatient basis at the patient's expense and which fully meets these tests:
>
> it is accredited as a Hospital by the Joint Commission on Accreditation of Healthcare Organizations or the American Osteopathic Association Healthcare Facilities Accreditation Program;
>
> it is approved by Medicare as a Hospital;
>
> it maintains diagnostic and therapeutic facilities on the premises for surgical and medical diagnosis and treatment of sick and injured persons by or under the supervision of a staff of physicians;
>
> it continuously provides on the premises 24-hour-a-day nursing services by or under the supervision of registered nurses (R.N.s); and
>
> it is operated continuously with organized facilities for operative surgery on the premises.[76]

The parties dispute whether the LifeCare facilities are accredited as hospitals.  Before denying Wall's claim, IMA verified that Medicare lists LifeCare as a "long-term care hospital."[77]

---

[76] P Wall App. at 182; P Evans App. at 120 (line spacing added by the Court).

LifeCare's Dallas and Shreveport facilities are each accredited as an "acute care hospital" by the Joint Commission on Accreditation of Hospitals.[78] However, the parties do not submit evidence showing whether a facility accredited as an "acute care hospital" is, or is not, accredited as a "Hospital" by the Joint Commission. Medicare distinguishes between hospitals and "long-term care hospitals," which are subject to different requirements and special certification.[79] However, the parties do not submit evidence showing whether a facility listed by Medicare as a "long-term care hospital" is, or is not, approved as a Hospital. Although the parties dispute whether the LifeCare facilities meet the other elements of a Hospital, their evidence was not part of the administrative record, and is not considered by the Court when making this factual determination. A reasonable person would not think that accreditation as an "acute care hospital" and approval as a "long term care hospital" are sufficient in and of themselves to support a conclusion that the LifeCare facilities were in fact neither accredited nor approved as "hospitals." Therefore, the Court concludes that this factor favors LifeCare.

2. Uniform Construction

To determine whether IMA gave the Plans a uniform construction, the Court considers whether it consistently applied the Plans to similarly situated applicants.[80] IMA consistently determined that LifeCare operated skilled nursing facilities when it denied Wall's and Evans's claims.

---

[77] IMA Wall Resp. App. at 179.
[78] P Wall App. at 433. LifeCare's accreditation by the Joint Commission was submitted to IMA in response to the denial of Evans's claim and is therefore contained in the administrative record. P Evans App. at 451-60.
[79] *See Vencor, Inc. v. Webb*, 33 F.3d 840, 842 (7th Cir. 1994) ("The field of long-term, acute care primarily involves the provision of care to the chronically ill who require lengthy recovery periods and life support systems. Due to the varying regulations governing Medicare and insurance reimbursement for this category of patients, long-term, acute care is relatively distinct, for most hospitals are unable to provide this type of care."); *see also* 42 U.S.C. § 1395x(e) (defining "hospital"); 42 U.S.C. § 1395i-3 (defining "skilled nursing facility"); 42 C.F.R. § 412.23(e) (requirements for long-term care hospitals).
[80] *See UNOCAL*, 570 F.3d at 258; *Fralick*, 2010 WL 2563429, at *12.

LifeCare submitted evidence concerning the benefits IMA awarded to another patient treated at LifeCare's Shreveport facility (the "Shreveport patient"), under the terms of the Housing Authority of Shreveport's Employee Benefit Plan, and the Defendants then submitted responsive evidence.[81]  The declaration of Renee Beckham, a consultant employed by LifeCare, alleges that after IMA found that LifeCare operated a skilled nursing facility and denied a portion of the Shreveport patient's bills, LifeCare provided documentation showing that its facility was an acute care hospital, and then IMA approved full payment.[82]  The affidavit of Kelly Webb, a claims supervisor employed by IMA, asserts that IMA determined LifeCare to be a skilled nursing facility, and IMA's audit department then discovered that a "per diem" rate provision in that Plan applied to the Shreveport patient's bills, as a result of which IMA paid the patient's bills in full because of the "per diem" rate, without varying its conclusion that LifeCare was a skilled nursing facility.[83]

Although the declaration and affidavit purport to describe terms in the Shreveport Housing Authority Plan, that Plan was not submitted, in contravention of Fed. R. Civ. P. 56(e)(1).[84]  By separate order, the Court has stricken the descriptions of the Housing Authority Plan under the best evidence rule.[85]  Without the Housing Authority Plan, the Court cannot verify the patient's entitlement to hospital or skilled nursing benefits or gauge the similarity of the Housing Authority Plan to the BRI and Carter Plans.  Because there is no evidence that the Shreveport patient was similarly situated to Wall and Evans, the Court lacks sufficient

---

[81] The patient's identity was redacted.

[82] P Wall App. at 791-821.

[83] IMA Evans Resp. App. at 1-3.

[84] *See E.E.O.C. v. Air Liquide USA LLC*, 692 F. Supp. 2d 658, 666 (S.D. Tex. 2010) ("[T]he court will not consider any affidavit testimony that does not comply with the standard set out in Rule 56(e)(1).").

[85] *See* Fed. R. Evid. 1002, 1004; *see generally Kiva Kitchen & Bath, Inc. v. Capital Distrib., Inc.*, 319 F. Appx. 316, 322-23 (5th Cir. 2009) (unpublished) (applying the best evidence rule only when the terms of a writing are being established); *R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 217-18 (5th Cir. 2005) (describing the best evidence rule).

information to determine whether IMA gave the Plans a construction in that instance that is consistent with that given to both Wall and Evans. Two applications of the Plans do not establish whether or not there was a generally uniform construction.[86] The Court concludes that this factor slightly favors Defendants, because the skilled nursing determination was made consistently in the Wall and Evans cases, with similar language in both Plans.

3. Unanticipated Costs

The third element is whether either interpretation would give rise to substantial costs to the Plans that are unanticipated under the Plans' plain meaning.[87] The Court analyzes whether costs are unanticipated when considering whether the administrator applied a fair reading to the terms.[88] The parties offer the same interpretation of "skilled nursing facility" and "hospital" based on the language of the Plans, and dispute whether the LifeCare facilities are, in fact, skilled nursing facilities or hospitals. The Court concludes that neither interpretation would result in unanticipated costs, because the administrators are obligated to pay benefits based on their factual determinations of whether the LifeCare facilities satisfy the elements of skilled nursing facilities or hospitals. Therefore, this factor is neutral.

For the reasons stated above, the Court concludes that IMA's determination that LifeCare operated skilled nursing facilities and did not operated hospitals was legally incorrect.

D. Abuse of Discretion

1. Internal Consistency of the Plans

The parties offer the same interpretation of the terms "skilled nursing facility" and "hospital"—that is, the Plans' definitions of those terms—and dispute only whether IMA made

---

[86] *See Kennedy v. Electricians Pension Plan,* 755 F. Supp. 700, 706 (M.D. La. 1991).
[87] *Crowell*, 541 F.3d at 316 (quoting *Batchelor v. Int'l Brotherhood of Electrical Workers Local 861 Pension and Retirement Fund*, 877 F.2d 441, 444-45 (5th Cir. 1989)).
[88] *Fralick*, 2010 WL 2563429, at *17.

sufficient factual findings about them. Therefore, this factor does not bear on the Court's determination.

2. Relevant Regulations

The parties cite no relevant regulations and the Court makes no determination on this factor.

3. Factual Background of the Determinations and Lack of Good Faith

Although IMA found that each LifeCare location met all seven elements of a skilled nursing facility, the administrative record shows that IMA investigated only the seventh element, approval and licensure by Medicare. IMA's investigation was plainly inadequate. Before an administrator determines whether a facility is a skilled nursing facility, the Plans require factual findings regarding a facility's license to provide professional nursing services, staffing and supervision by nurses and physicians, maintaining records and a utilization review plan, and the type of care offered and the manner in which it is delivered. Because the administrative record does not contain substantial evidence to support IMA's determination that LifeCare operated skilled nursing facilities, that is, that all seven elements of a skilled nursing facility as defined in the Plans were met, IMA abused its discretion in so finding.

The parties submitted evidence going to whether the LifeCare facilities fulfill the first two elements of a skilled nursing facility, but such evidence is outside the administrative record and thus is not considered by the Court. Were the Court to consider such evidence, it would still reach the same conclusion, because Defendants have provided no evidence in support of elements four, five, or six of the Plans' definition of a skilled nursing facility.

The LifeCare facilities were approved by Medicare as "long term care hospitals" and accredited by the Joint Commission as "acute care hospitals." Apparently, IMA did not

investigate whether Medicare considers long term care hospitals to be "Hospitals" or whether the Joint Commission considers acute care hospitals to be "Hospitals." Therefore, there was not a rational connection between the facts known to IMA and its determination that the LifeCare facilities were not hospitals. The Court concludes that IMA's finding that the LifeCare facilities were skilled nursing facilities, and were not hospitals, was an abuse of discretion.

*Conclusion*

As stated above, LifeCare's breach of contract and deceptive insurance practices claims are preempted and Defendants are granted summary judgment on such claims. The Court grants summary judgment for LifeCare on its ERISA claim to recover benefits under the Plans, and otherwise denies that motion.

Therefore, the motions originally filed by in 3:08-CV-1642-M are decided as follows: Defendants Insurance Management Administrators, Inc., Carter Chambers, LLC, and Carter Chambers Employee Benefit Plan's Motion for Summary Judgment [Docket Entry #35] is **GRANTED** on Plaintiff's non-ERISA claims and otherwise **DENIED**; Plaintiff's Motion for Summary Judgment [Docket Entry #36] is **GRANTED** on its ERISA claims, and otherwise **DENIED**; and Defendants Beech Street Corporation, Viant Holdings, Inc., Viant Payment Systems, Inc., and Viant Management Services, Inc.'s Motion for Summary Judgment [Docket Entry #39] is **GRANTED**.

The motions filed in 3:08-CV-1641-M are decided as follows: Defendant Insurance Management Administrators, Inc.'s Motion for Summary Judgment [Docket Entry #41] and Defendants Bill & Ralph's, Inc. and Bill & Ralph's, Inc. Employee Benefit Plan & Trust's Motion for Summary Judgment [Docket Entry #42] are **GRANTED** on Plaintiff's non-ERISA

claims, and otherwise **DENIED**; and Plaintiff's Motion for Summary Judgment [Docket Entry

#43] is **GRANTED** on its ERISA claims, and otherwise **DENIED**.

A judgment consistent with this Opinion will follow.

**SO ORDERED**.

January 19, 2011.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**